JENNIFER BLODGETT,
    *Plaintiff,*

    v.                             No. 3:17-cv-766 (VAB)

22 SOUTH STREET OPERATIONS,
    *Defendant.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Jennifer Blodgett ("Plaintiff") has sued 22 South Street Operations, LLC ("22 South Street Operations") under the Family Medical Leave Act ("FMLA"), for both interference and retaliation, and the Americans with Disabilities Act ("ADA"), for failure to accommodate and retaliation, as well under the Connecticut Fair Employment Practices Act ("CFEPA"), for disability discrimination and retaliation. Complaint, ECF No. 1, at 5–12.

22 South Street Operations now has moved for summary judgment in this case. Motion for Summary Judgment, ECF No. 70.

For the following reasons, the Court **GRANTS** 22 South Street Operation's motion for summary judgment as to the ADA and FMLA claims.

The Court also declines to exercise supplemental jurisdiction over Ms. Blodgett's state law claims and therefore directs the Clerk of Court to close this case.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

22 South Street Operations owns and operates Fox Hill Center, a 150-bed skilled nursing facility with 148 employees in Rockville, Connecticut. Commission on Human Rights and Opportunities June 6, 2016 Letter, ECF No. 78-11; Compl. at ¶ 14 ("Defendant owns and

operates the Fox Hill Center located at 1253 Hartford Turnpike, Vernon, Connecticut 06066").

Licensed by the Connecticut Department of Public Health, Fox Hill Center must adhere to

federal and state nursing requirements and federal guidelines on Medicare and Medicaid funds.

Commission on Human Rights and Opportunities June 6, 2016 Letter, ECF No. 78-11.

In December 2008, Fox Hill Center hired Jennifer Blodgett to work as a Licensed

Practical Nurse/management-level Charge Nurse. Affidavit of Gaye Cassells, ECF No. 71-1

("Cassells Aff."), at ¶ 3. In that role, Ms. Blodgett's essential job functions were to: "Directly

provide safe care and nursing services for elderly, infirmed patients; Supervise and coordinate

nursing personnel in providing direct patient care; Develop and implement patient care plans to

ensure patient safety and comfort; Assist physicians in examination and patient care." *Id.* In

addition, Ms. Blodgett had to "[c]ontribute to an environment that is respectful, team-oriented,

and responsive to the concerns of staff, patients and families." *Id.* at ¶ 5.

In March 2012, Fox Hill Center met with Ms. Blodgett after she allegedly "failed to

appropriately handle a 'combative' dementia patient." *Id.* at ¶ 6; Ex. 2 to Ex. A, ECF No. 71-1.

In October 2014, Fox Hill Center disciplined Ms. Blodgett for "'verbally abusing' at least

one dementia patient." Cassells Aff. at ¶ 9. After investigating the incident, Fox Hill Center

"concluded that Plaintiff had 'yelled at least one resident.'" *Id.* at 10; Ex. 3 to Ex. A, ECF

No. 71-1, at 1. Fox Hill Center contends that it "clearly instructed Plaintiff that she would be

terminated if any similar any similar instances occurred in the future." Cassells Aff. at ¶ 11;

Ex. 3 to Ex. A, ECF No. 71-1, at 2.

On April 20, 2015, Ms. Blodgett received a performance evaluation, noting that, at that

time, she "exceeds expectations." Ex. P5, ECF No. 78-8.

On December 16, 2015, Fox Hill Center fired Ms. Blodgett's son, who also worked at

Fox Hill Center in the kitchen area, for performance issues. Cassells Aff. at ¶¶ 13–14. The Human Resources Department asked Gaye Cassells to let Ms. Blodgett know of her son's termination. *Id.* at ¶ 16. After Ms. Cassells told Ms. Blodgett of her son's termination, Ms. Blodgett allegedly became enraged and began yelling profanity before storming out of the room. *Id.* at ¶¶19–22.

According to staff accounts, Ms. Blodgett then threatened employees, cursed at them, and pushed over a cart in the kitchen before leaving the facility. *Id.* at ¶¶ 25, 27; Exs. 4 & 5 to Ex. A, ECF No. 71-1. Ms. Blodgett does not recall what happened after Ms. Cassells told her that Fox Hill Center fired her son. Jennifer Blodgett September 14, 2018 Deposition, Ex. D, ECF No. 71-1 ("Blodgett September 14, 2018 Dep."), at 72:10–74:14.

Later that day, Nancy Pagani, Ms. Blodgett's supervisor, called Ms. Blodgett to inform her of her suspension pending an investigation. Cassells Aff. at ¶ 28. Ms. Blodgett does not recall Ms. Pagani telling her about her suspension. Blodgett September 14, 2018 Dep. at 94:6–10. Ms. Blodgett alleges that she only learned about the suspension days later, when Fox Hill Center sent her a letter. *Id.* at 97:17–20; *see also* December 16, 2015 Suspension Letter, ECF No 78-16.

That same day, Ms. Blodgett contacted Ms. Cassells to request FMLA paperwork, which Ms. Cassells provided to her. Cassells at ¶ 29.

On December 17, 2015, Ms. Blodgett submitted an employee request for leave of absence, citing continuous disability under the FMLA. Employee Request for Leave of Absence, ECF No. 78-14.

On December 18, 2015, Ms. Blodgett submitted a partially completed FMLA application, and then supplemented the application days later with a medical certification from Dr. Serge

Poulin. Affidavit of Stephanie Willis, ECF No. 71-1 ("Willis Aff."), at ¶ 4; Ex. 1 to Ex. B, ECF No. 71-1, at 4. Ms. Blodgett submitted her FMLA application to "Fox Hill's out-of-state corporate leave management division," but allegedly "[n]o one from Fox Hill reviewed plaintiff's application for FMLA leave, or rendered any decision to her application." Cassells Aff. at ¶ 30.

According to the Fox Hills Center Leave Analyst, "Plaintiff's application was reviewed by a Leave Specialist in conjunction with a Nurse Consultant" and "the Nurse Consultant determined that the medical certification Plaintiff submitted was insufficient, as it failed to certify a serious health condition sufficient to warrant FMLA leave." Willis Aff. at ¶¶ 6–7. Because of the failure to submit a proper medical certification, the Leave Analyst denied Ms. Blodgett's FMLA leave application. *Id.* at ¶ 8.

Ten days later, a Leave Specialist retroactively granted Ms. Blodgett's personal leave of absence from December 17, 2015 to January 9, 2016. *Id.* at ¶ 9; Ex. P12, ECF No. 78-15.

On January 8, 2016, Dr. Poulin cleared Ms. Blodgett to return to work. Willis Aff. at ¶ 10.

According to Ms. Blodgett, she spoke with Nancy Pagani two to three weeks before her termination about feeling depressed because of deaths at the facility, but never communicated a medical diagnosis of depression. Blodgett September 14, 2018 Dep. at 70:9–15; 86:7–87:10.

On January 11, 2016, Ray Talomona, Pam Liggins, Nancy Pagani, and Gaye Cassells met with Ms. Blodgett to complete the investigation into her behavior on December 16, 2015. Cassells Aff. at ¶¶ 32, 33.

After that meeting, Ms. Liggins, Ms. Pagani, and Ms. Cassells "decided to terminate Plaintiff's employment due to her unprofessional conduct, and messaged that to Plaintiff,

effective immediately." *Id.* at 34.

On July 7, 2016, Ms. Blodgett applied for Social Security disability insurance benefits, and reported a disabling depression, anxiety, and post-traumatic stress disorder. *Id.* She also said that she was disabled since December 16, 2015. Ex. C, ECF No. 71-1; Blodgett September 14, 2018 Dep. at 131:19–21.

On June 28, 2018, the Social Security Administration rendered a fully favorable decision on Ms. Blodgett's disability, noting that Ms. Blodgett "has been under a disability as defined in the Social Security Act since December 16, 2015, the alleged onset date of disability." Notice of Decision, ECF No. 71-1.

Though the Social Security Administration declared Ms. Blodgett disabled, Ms. Blodgett believed that she could return to work a full shift on January 15, 2016. February 11, 2019 Deposition of Jennifer Blodgett, ECF No. 71-1, at 19:3–6. Ms. Blodgett also allegedly never requested any hours or duty accommodations from anyone at Fox Hill Center. *Id.* at 23:4–13.

### B. Procedural History

On May 9, 2017, Ms. Blodgett filed her Complaint against 22 South Street Operations. Complaint, ECF No. 1.

On July 12, 2017, 22 South Street Operations responded to the Complaint with an Answer and affirmative defenses. Answer to Complaint with Affirmative Defenses, ECF No. 13.

On October 5, 2018, the Court held a post-discovery telephonic status conference. Minute Entry, ECF No. 52.

On March 29, 2019, 22 South Street Operations moved for summary judgment in this case. Motion for Summary Judgment, ECF No. 70.

On May 20, 2019, Ms. Blodgett objected to 22 South Street Operation's motion for

summary judgment. Objection re Motion for Summary Judgment, ECF No. 78.

On June 28, 2019, the Court held a hearing on 22 South Street Operation's motion for summary judgment.

## II.     STANDARD OF REVIEW

Motions for summary judgment are granted when the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing specific facts to prove that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original). The moving party, however, may satisfy this burden by pointing to an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When documentary evidence and sworn affidavits supporting a motion for summary judgment "demonstrate [] the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment then "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also*

*Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'" (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. N.Y.C.*, 874 F.3d 338, 347 (2d Cir. 2017). A court will not credit conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor, the court will find for the moving party as a matter of law and grant the summary judgment motion. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## III.  DISCUSSION

Ms. Blodgett brings claims under both federal and state law regarding her termination. The Court will address Ms. Blodgett's federal claims first because, if she has no viable claims under federal statute, the Court must then determine whether it will exercise supplemental jurisdiction over the remaining state-law claims.

### A.  Federal Law Claims

#### 1.  The FMLA claims

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the

birth or adoption of a child, and for the care of child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1). "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2612(a)(1)).

The FMLA further entitles the employee "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms of employment." 29 § 2614. And "[i]t shall be unlawful for any employer to interfere with, restrain or deny the exercise or the attempt to exercise any right provided" by the law. 29 U.S.C. § 2615. The law "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista v. CDC Ixis N. Am.*, Inc., 445 F.3d 161, 174 (2d Cir. 2006).

### a.    FMLA Interference

To establish a prima facie FMLA interference claim, a plaintiff must show that: "(1) she is an FMLA-eligible employee; (2) the defendant is an employer, as defined in the FMLA; (3) she was entitled to take FMLA leave; (4) she gave notice to her employer of her intention to take leave; and (5) she was denied FMLA benefits to which she was entitled." *Hewitt v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 16 (D. Conn. 2016) (citing 29 U.S.C. § 2612(a)(1); *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x. 20 (2d Cir. 2014)). The Second Circuit also has suggested that a terminated plaintiff must show that the employer "considered [the exercise of FMLA rights] a negative factor in its decision to terminate [her]." *Sista*, 445 F.3d at 176.

22 South Street Operations argues that because Ms. Blodgett received twenty-five days of

leave, an amount of time comparable to any FMLA leave, she was not "denied FMLA benefits to which she was entitled." *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment, ECF No. 71 ("Def.'s Mem. in Supp. of MSJ."), at 23, 25–26. Moreover, South Street Operations argues that there can be no FMLA interference when the denial of FMLA leave stems from Ms. Blodgett's failure to produce the required FMLA information— here, Ms. Blodgett did not produce a medical certification sufficient to show that her health issues were a serious health problem that necessitated FMLA leave. *Id.* at 24–25.

In response, Ms. Blodgett argues that 22 South Street Operations merely approved her personal medical leave without mentioning any deficiencies in the FMLA application. Plaintiff's Objection to Defendant's Motion for Summary Judgment, ECF No. 78 ("Pl.'s Obj. to Def.'s MSJ."), at 24–25. Ms. Blodgett further argues that a reasonable juror could determine that another employee would be discouraged from taking approved medical leave. *Id.* at 25.

The Court disagrees.

Because Ms. Blodgett received the amount of leave she requested, 22 South Street Operations did not prevent her from taking leave.

To the extent Ms. Blodgett's claim rests on the notion that her FMLA certification was denied, even after she received leave, under 29 U.S.C. § 2613(b), a sufficient certification states "(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . . [and] for purposes of leave under section 2612(a)(1)(D) of this title, a statement that the employee is unable to perform the functions of the position of the employee." In certain situations, an FMLA certification must "be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). "In a general

sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Wood v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) (citing *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)).

22 South Street Operations denied Ms. Blodgett's FMLA certification "due to her failure to submit a sufficient medical certification." Willis Aff. at ¶ 8; Cassells Aff. at ¶ 30.

After Nancy Pagani called Ms. Blodgett to inform her of her suspension, pending an investigation, Ms. Blodgett contacted Gaye Cassells to request FMLA paperwork. Cassells Aff. at ¶ 28–29. The following day, Ms. Blodgett submitted an incomplete employee request for leave of absence citing continuous disability under the FMLA. Employee Request for Leave of Absence, ECF No. 78-14.

On December 18, 2015, Ms. Blodgett submitted a partially completed FMLA application, and supplemented it five days later with a medical certification from Dr. Serge Poulin. Willis Aff." at ¶ 4; Ex. 1 to Ex. B, ECF No. 71-1, at 4. According to the Fox Hills Center Leave Analyst, "Plaintiff's application was reviewed by a Leave Specialist in conjunction with a Nurse Consultant" and "the Nurse Consultant determined that the medical certification Plaintiff submitted was insufficient, as it failed to certify a serious health condition sufficient to warrant FMLA leave." Willis Aff. at ¶¶ 6–7. Because of the failure to submit a proper medical certification, the Leave Analyst denied Ms. Blodgett's FMLA leave application, but then approved her personal leave. *Id.* at ¶¶ 8–9.

Because Ms. Blodgett's employer is entitled to rely on information provided by the certification form in making its FMLA determination and may require that request for leave be supported with health care provider information, there was no FMLA protected activity in this

case. *See* 29 U.S.C. § 2613 ("An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee"); 29 C.F.R. § 825.306(e) ("In all instances in which certification is requested, it is the employee's responsibility to provide the employer with complete and sufficient certification and failure to do so may result in the denial of FMLA leave."); *see also Graziado*, 817 F.3d at 526 ("Under the FMLA, an employee seeking leave need not submit a medical certification *unless and until one is specifically requested by her employer*." (emphasis in original)).

Accordingly, Ms. Blodgett's FMLA interference claim must be dismissed.[1]

### b.    FMLA Retaliation

To establish a prima facie case of FMLA retaliation, the Plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziado*, 817 F.3d at 429 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

At this stage, "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 48 (2d Cir. 1987)). Retaliation claims thus proceed in three parts. First,

---

[1] To the extent that Ms. Blodgett's FMLA interference claim is based on the refusal to rehire her when she sought to return from leave, this argument is no different from her FMLA retaliation claim, which is analyzed below, and also dismissed.

"[i]f a plaintiff sustains the initial burden, a presumption of retaliation arises." *Id.* Second, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)). Third, "once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citing *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120–21 (2d Cir. 1997)).

22 South Street Operations argues that Ms. Blodgett cannot meet her burden for a prima facie case of retaliation because she did not exercise a right protected by the FMLA and there were legitimate non-retaliatory reasons for Ms. Blodgett's termination. Def.'s Mem. in Supp. of MSJ. at 28–29. Because Ms. Blodgett's FMLA leave was never approved for lack of sufficient medical certification, 22 South Street argues that she cannot establish the first element of an FMLA retaliation claim. *Id.*

Even if she could establish a prima facie case, 22 South Street asserts that Ms. Blodgett's unprofessional conduct provided a legitimate non-retaliatory reason for her termination. *Id.* at 29.

In response, Ms. Blodgett argues that she has properly exercised FMLA rights, was legally disabled, and terminated in a way that creates an inference of retaliatory intent because of the temporal proximity to her exercise of an FMLA right. Pl.'s Obj. to Def.'s MSJ. at 25. She also reiterates that her employer allowed other employees to continue working with similar conduct that caused her to lose her job. *Id.* at 26.

In reply, 22 South Street Operations argues that the deposition of Pam Liggins shows that two of the three employees Ms. Blodgett uses for her FMLA retaliation claim took FMLA leave and are still working at Fox Hill Center. Reply to Response, ECF No. 81, at 8–9. Moreover, 22

South Street argues that the employees cited were not similar in all material respects because two had different titles and responsibilities, one was not a management level employee, and none of the three employees engaged in the same conduct as Ms. Blodgett. *Id.* at 9–10. These employees therefore are not comparisons for a similarly situated case of FMLA retaliation. *Id.* at 10.

The Court agrees.

As discussed above, Ms. Blodgett's employer denied her FMLA application before any potentially protected FMLA activity took place. Even if there was an adverse employment action, Ms. Blodgett still must show that "a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Sista*, 445 F.3d at 177 (internal citations omitted) (denying leave to amend for claims involving FMLA and ADA retaliation).

Temporal proximity can provide a basis for a causal connection. *See, e.g.*, *Donnelly v. Greenberg Cent. Sch. Dist. No. 7*, 692 F.3d 134, 152 (2d Cir. 2012) (reversing a grant of summary judgment where plaintiff had demonstrated temporal proximity and the evidence provided "a sufficient basis to send the question of the school's retaliatory intent to the jury to reach a final determination."). But where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *Sotomayor v. N.Y.C.*, 713 F.3d 163, 164 (2d Cir. 2013) (finding no prima facie case of FMLA retaliation where the plaintiff began receiving negative evaluations and letters in her file before her application for her first FMLA leave); *see also Elliot-Leach v. N.Y.C. Dep't. of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on

temporal proximity to suggest retaliatory intent, her retaliation claim fails.").

Here, aside from temporal proximity, Ms. Blodgett argues that she is similarly situated to three employees still employed at Fox Hill Center after similar conduct. But Ms. Blodgett "must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation and internal quotation marks omitted). Yet there is nothing in this record to support the necessary showing because two of these three employees took FMLA leave and are still employed by Fox Hill Center. *See* Deposition of Pamela Liggins, ECF No. 81-1, at 4:22–5:11; 7:13–8:5. And none of them had same role, responsibilities, or engaged in the same conduct as Ms. Blodgett. *See id.* 9:12–23; 13:4–7; 20:4–24:20; 27:13–23. The Court therefore has no basis to find that 22 South Street Operations terminated employees that are similarly situated to Ms. Blodgett for similar conduct or any other admissible evidence of retaliation. *See Goldfarb v. Town of W. Hartford*, 474 F. Supp. 2d 356, 368 (D. Conn. 2007) (Squatrito, J.) (granting a motion for summary judgment where the defendant "has provided no evidence from which a jury could reasonably find that other [defendant] employees who took sick or FMLA leave were prima facie similarly situated to [Plaintiffs]"); *see also Robinson*, 781 F.3d at 44 (noting that "a plaintiff may not survive summary judgment merely by conjuring a hypothetical issue of material fact.").

As a result, Ms. Blodgett is left with temporal proximity alone, which is insufficient at this stage of the case to survive summary judgment. S*ee, e.g., Zan Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."); *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such

temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *Elliot-Leach*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails.")

In any event, even if Ms. Blodgett had established an adverse employment action or a causal connection, her employer had a legitimate non-retaliatory reason for her termination: her behavior. In March 2012 and October 2014, disciplined Ms. Blodgett for her failure to handle a dementia patient and verbally abusing another dementia patient. Cassells Aff. at ¶¶ 6, 9–10; Ex. 2 to Ex. A, ECF No. 71-1. After an investigation into the last incident, Fox Hill Center "clearly instructed Plaintiff that she would be terminated if any similar any similar instances occurred in the future." Cassells Aff. at ¶ 11; Ex. 3 to Ex. A, ECF No. 71-1, at 2.

On December 16, 2015, Ms. Blodgett became enraged and began yelling profanity at Ms. Cassells after being told of her son's termination. Cassells Aff. at ¶¶19–22. According to staff accounts, Ms. Blodgett then threatened employees, cursed at them, and pushed over a cart in the kitchen before leaving the facility. *Id.* at ¶¶ 25, 27; Exs. 4 & 5 to Ex. A, ECF No. 71-1. Later that day, Nancy Pagani, Ms. Blodgett's supervisor, called Ms. Blodgett to inform her of her suspension pending an investigation. Cassells Aff. at ¶ 28.

Because, "these offers of proof satisfy [Defendant]'s burden of articulating legitimate, non-retaliatory reasons to explain the actionable claims of adverse employment action," *Jute*, 420 F.3d at 180, Ms. Blodgett would have to otherwise show that there is evidence to support her claim of retaliation. As discussed above, however, there is no such evidence.

Accordingly, Ms. Blodgett's FMLA retaliation claim must be dismissed.

## 2.    The ADA claims

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

To establish a prima facie case of disability discrimination, otherwise known as a failure to accommodate under the ADA, a plaintiff must show that:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. N.Y.C.*, 711 F.3d 120, 125–26 (2d. Cir. 2013) (citing *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009)).

The parties do not dispute that Ms. Blodgett's disability at the time of her termination or that the ADA is applicable to 22 South Street Operation's institution, Fox Hill Center. But there are disputes as to whether Ms. Blodgett put Fox Hill Center on notice of her disability or whether Ms. Blodgett could perform the essential functions of her job as a nurse with reasonable accommodations and that 22 South Street Operations refused to make such accommodations.

22 South Street Operations argues that because the Social Security Administration declared Ms. Blodgett disabled and unable to work, she is not qualified to perform an essential function of her job and no reasonable accommodation required under the ADA could have been made for her. *See* Def.'s Mem. in Supp. of MSJ. at 12–14, 16.

22 South Street Operations also argues that Ms. Blodgett received the only reasonable

accommodation she requested—her temporary leave—and no other accommodations were requested or practical. *Id.* at 14–15. Because Ms. Blodgett requested no other modifications to hours or duties, 22 South Street argues that Ms. Blodgett cannot establish her prima facie case for an ADA failure to accommodate claim. *Id.* at 15–16.

Finally, 22 South Street Operations argues that it had legitimate non-discriminatory reasons for terminating Ms. Blodgett. *Id.* at 19. According to its staff, Ms. Blodgett engaged in unprofessional and aggressive behavior toward other staff members that called for termination, behavior unrelated to her disabling depression or anxiety. *Id.* at 19 –20.

In response, Ms. Blodgett argues that she can demonstrate the first three prongs of a prima facie case for an ADA failure to accommodate claim: (1) the applicability of the ADA to 22 South Street Operations; (2) the existence of a disability; and (3) the ability to perform the essential functions of her job. *See* Pl.'s Obj. to Def.'s MSJ. at 11–14. Ms. Blodgett then argues that Defendant granted her leave of absence only to terminate her shortly after she returned— which, in her view, constitutes a failure to accommodate her disability actionable under the ADA. *Id.* at 20.

In support of this claim, Ms. Blodgett alleges that similarly situated employees who were not terminated for similar conduct. *Id.* at 16. Once the burden shifts backs to her, after 22 South Street Operations' legitimate non-discriminatory reason for her termination, Ms. Blodgett asserts that other justifications were merely pretexts for impermissible discrimination. *Id.* at 18–19.

The Court disagrees.

### a. Notice of Disability

As an initial matter, "an employer is only responsible for employment decisions based on information available to it when it decides." *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 725

(2d Cir. 1994). And "[a]n employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Thompson v. N.Y.C.*, No. 98 Civ. 4725 (GBD), 2002 WL 31760219, at *7 (S.D.N.Y. Dec. 9, 2002) (citation omitted).

Ms. Blodgett relies on an alleged conversation she had with her supervisor, Nancy Pagani, as notice of her disability. *See* Blodgett September 14, 2018 Dep. at 86:22–87:2 ("I believe the time I can remember is when I walked into [Nancy Pagani's] office crying . . . and said that I was having a hard time with some of the deaths that happened at the facility and that I was feeling depressed and I was crying all the time, including on the job."). Ms. Blodgett, however, did not inform Ms. Pagani that she had received a medical diagnosis of depression. *Id.* at 87:7–10 ("Q. Did you tell Nancy Pagani during that conversation that you had been medically diagnosed with depression? A. Probably not, no.").

Ms. Blodgett also never notified her employer of her need of an accommodation. "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)). While Ms. Blodgett informed Ms. Pagani of her problems dealing with her job, there is nothing in this record indicating that her employer "knew or reasonably should have known that [Ms. Blodgett] was disabled." *Id.*

Because "an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability," *see Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001), Ms. Blodgett has failed to establish the notice prong of

disability discrimination or a reasonable accommodation claim. *See McBride*, 583 F.3d at 97 (requiring that "an employer covered by the statute had notice of his disability" to establish a prima facie disability discrimination or failure to accommodate case).

b. **Ability to Perform Essential Functions with Reasonable Accommodation**

The ADA defines "reasonable accommodation" as including but not limited to "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position . . . ." 42 U.S.C. § 12111(9)(B). ADA regulations further state that an employer is required to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

A reasonable accommodation may include modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B); *see also Jackan v. N.Y. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). When discrimination actions are based on adverse employment actions or a failure to accommodate, the Plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified."[2] *See McBride,* 583 F.3d at 97.

---

[2] By contrast, regarding the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not, on their face, exceed the benefits. The burden of persuasion falls on the defendant employer. *See Jackan*, 205 F.3d at 566; *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).

But nothing in the record indicates that Ms. Blodgett ever requested a modification to her job, while she was employed. Rather, her employer granted the only medical leave requested in this record. *See* Willis Aff. at ¶ 9; Ex. P12, ECF No. 78-15. Ms. Blodgett only returned to work after Dr. Poulin cleared her to return on January 8, 2016. Willis Aff. at ¶ 10. In short, there is no evidence that there was ever a reasonable accommodation request or refusal to accommodate that request.

Even if the Court could conclude that a request for an accommodation had been made, the decision on Ms. Blodgett's Social Security disability claim precludes any reasonable accommodation. While the receipt of Social Security disability benefits does not bar a recipient from pursuing an ADA claim, *see Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6–7 (2d Cir. 1999), "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 798 (1999). As a result, Ms. Blodgett "must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" *Id.*

Ms. Blodgett, however, has not reconciled the Social Security disability benefits decision with her ADA accommodation claim, except to claim she could work a full shift again. Instead, she has made a sworn assertion of total disability without "explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Compare* Ex. C, ECF No. 71-1 ("I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON December 16, 2015. I AM STILL DISABLED") & Pl.'s Obj. to Def.'s MSJ. at 15 ("Plaintiff was qualified for the job and could perform the essential functions. Plaintiff was employed by Defendant without issue for years . . . In her deposition, Plaintiff testified that she was capable of

working a full shift."), *with Cleveland*, 526 U.S. at 807 ("When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'").

Without an explanation "sufficient to warrant a reasonable juror's concluding that . . . the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation [,]'" there is no record evidence to support Ms. Blodgett's reasonable accommodation claim. *Id.*

Accordingly, Ms. Blodgett's ADA accommodation claim must be dismissed.

### 3. ADA Retaliation Claim

To state an ADA retaliation claim, a plaintiff must show "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman– Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). Under the applicable burden-shifting analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride*, 583 F.3d at 96 (citing *Sista*, 445 F.3d at 169); *see also Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 347 (D. Conn. 2016) (Bolden, J.)

(adopting and applying the retaliation analysis of an earlier ADA claim to an FMLA claim).

22 South Street Operations argues that there was no causal connection between Ms. Blodgett's termination and any ADA protected activity. Def.'s Mem. in Supp. of MSJ. at 20. Rather than the discriminatory animus required by the ADA, 22 South Street Operations argues that it granted Ms. Blodgett twenty-five days of personal leave and delayed its investigation until after Ms. Blodgett returned. *Id.* at 21–22. Because there is no evidence construing its employment decisions as a pretextual termination, 22 South Street Operations argues that there can be no retaliation under the ADA. *Id.* at 22–23.

In response, Ms. Blodgett argues that she engaged in a protected activity when she notified Nancy Pagani of the need for time off and followed up by submitting an FMLA request form. Pl.'s Obj. to Def.'s MSJ. at 21. In her view, as long as Ms. Blodgett made the claim in good faith, she meets the protected activity prong of a retaliation case. *Id.* Ms. Blodgett then argues that Nancy Pagani knew that she needed the reasonable accommodation of a finite leave of absence. *Id.* at 22. Ms. Blodgett then claims that her termination for exercising those rights was an adverse employment outcome. *Id.* For a causal connection, Ms. Blodgett argues that the time between her protected activity and adverse employment action is sufficient. *Id.*

Ms. Blodgett also argues that any other explanation for her termination should not be addressed at this stage of the case. *Id.* at 22–23.

The Court disagrees.

Ms. Blodgett's retaliation claim suffers from the same deficiencies as her FMLA discrimination and ADA reasonable accommodation claims. Here, as there, "an employer is only responsible for employment decisions based on information available to it when it decides." *Heilweil*, 32 F.3d at 725. And "[a] n employee has the initial duty to inform the employer of a

disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Thompson*, 2002 WL 31760219, at *7.

As discussed above, however, there is no evidence that Ms. Blodgett informed her employer of her disability. Her conversation with Nancy Pagani about feeling depressed, *see* Blodgett September 14, 2018 Dep. at 86:22–87:7–10, does not create a genuine issue of material fact for her ADA claim because of the absence of any verified medical information.

Because "an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability," *see Felix*, 154 F. Supp. 2d at 657, Ms. Blodgett has failed to establish the notice prong of an ADA retaliation claim. *See McBride*, 583 F.3d at 97 (requiring that "an employer covered by the statute had notice of his disability" to establish a prima facie disability discrimination or failure to accommodate case).

Even if she had established notice, as mentioned above, Ms. Blodgett's ADA retaliation claim falls short for three reasons. First, as discussed above, Ms. Blodgett has failed to create a genuine issue of material fact as to whether a causal connection existed between her termination and the exercise of a protected activity. Second, 22 South Street Operations has articulated legitimate, non-discriminatory reasons her discharge: her behavior. Third, once the burden shifts back to Ms. Blodgett, the record evidence is insufficient to create a genuine issue of material fact for the jury on her claim of retaliation. More specifically, as discussed above with respect to her FMLA retaliation claim, there is no record evidence that 22 South Street Operations terminated similarly situated employees for similar conduct or any other admissible evidence of retaliation.

Accordingly, Ms. Blodgett's ADA retaliation claim must be dismissed.

**B.     State Law Claims**

Having dismissed Ms. Blodgett's federal claims, the Court declines to exercise

supplemental jurisdiction over Ms. Blodgett's remaining state law claims. *Kolari v. N.Y.-*

*Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("a district court 'may decline to exercise

supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction'"

(citing 28 U.S.C. § 1367(c)(3)).

**IV.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** 22 South Street Operation's Motion for

Summary Judgment as to the ADA and FMLA claims.

The Court also declines to exercise supplemental jurisdiction over Ms. Blodgett's CFEPA

claims.

The Court respectfully directs the Clerk of the Court to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 8th day of July 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE